## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 4:24-CR-00050-JFH |
| | ) |
| LEE HOLT and JENNIFER | ) |
| CHARISA HARRINGTON, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Before the Court, by referral of Chief District Judge John F. Heil, is defendant Lee S. Holt's Motion to Suppress (Doc. 67), to which the plaintiff responded (Doc. 79) and Mr. Holt replied (Doc. 83). Defendant Jennifer C. Harrington properly joined the Motion pursuant to LCrR47-10. (Doc. 76). The defendants request that the Court suppress evidence of items seized during the search of their residence on August 29, 2023. The Government argues that the Cherokee Nation Search Warrant was supported by probable cause, but even if it was not, the good faith exception to the exclusionary rule should be applied to avoid suppression of the evidence.

On May 21, 2024, the Court conducted an evidentiary hearing on the Motion, heard the testimony of Oklahoma Bureau of Narcotics (OBN) Agent Tara Winter, and received in evidence the "Affidavit for Search Warrant" submitted to Cherokee Nation Judge Luke Barteaux and the "Affidavit for Search Warrant" submitted to Tulsa County Judge Kasey Baldwin, upon which search warrants were issued. Upon consideration of the defendant's

motion, the briefing, witness testimony, the affidavits in evidence, and the parties' oral arguments, the undersigned recommends that the Motion be **denied.** The undersigned finds that the Cherokee Nation warrant affidavit lacked probable cause for the search under the specific facts of this case but that the good faith exception to the exclusionary rule should be applied.

## I.      Standards Applicable to Suppression Proceedings

A motion to suppress is recognized and governed by Rule 12. *See* Fed. R. Crim. P. 12(b)(3)(C). The purpose of a suppression hearing is to "determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the [Constitution]." *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982). When making such a determination, "the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a); *see also Merritt*, 695 F.2d. at 1269-70.

"Generally, 'if the search or seizure was pursuant to a warrant, the defendant has the burden of proof.'" *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994) (quoting *United States v. Muldrow*, 19 F.3d 1332, 1335 (10th Cir. 1994)). "The controlling burden of proof at a suppression hearing is proof by a preponderance of the evidence." *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). "The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court." *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004); *see also United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007).[1]

---

[1]      When reviewing a district court's ruling on a motion to suppress, the Court of Appeals views the evidence in the light most favorable to the prevailing party. *See United*

Pursuant to Rule 12(d), "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." The facts set forth below constitute the undersigned's proposed essential findings on the defendants' suppression motion.

## II.    Background

### A.    OBN's Controlled Buys and GPS Tracking of a Third Party

This case arises out of an investigation into the distribution of methamphetamine. At the suppression hearing, OBN Agent Tara Winter testified that, in June of 2023, the OBN began investigating Michael Leach for the distribution of methamphetamine. In June and July of 2023, the OBN used a confidential informant (CI) to purchase drugs from Mr. Leach on two occasions in Claremore, Oklahoma. During one of the transactions, Mr. Leach allegedly informed the CI that his source was "up the hill." At the hearing, the plaintiff's counsel asserted that "'up the hill' equates to west of Collinsville."

OBN Agent McClaren applied for a GPS tracker warrant for Mr. Leach's vehicle, a blue Nissan Murano. On June 27, 2023, Agent McClaren installed the tracker on Mr. Leach's vehicle, and the OBN tracked the vehicle for approximately two months. During that time, the OBN received a tip from the CI that Mr. Leach was going to meet with his supplier. Agent McClaren conducted surveillance and observed Mr. Leach on his return from Collinsville. The GPS tracker indicated that Mr. Leach went to Collinsville and briefly visited a house at 117 North 21st Street in Collinsville, Oklahoma approximately

---

*States v. Torres*, 987 F.3d 893, 899 (10th Cir. 2021); *Kimoana*, 383 F.3d at 1220. The district court's factual findings are reviewed for clear error. *United States v. Ellison*, 791 F.2d 821 (10th Cir. 1986).

nine times during those two months. The address is in the Northern District of Oklahoma on Cherokee Nation tribal land and is the location where the defendants reside.

**B.      The Trash Pull**

On August 21, 2023, OBN Agents Winter and Jodi Willingham conducted a trash pull at the defendants' residence. Agent Winter testified that the trash can had been placed on the curb for collection. Therein, she found two small plastic bags containing residue of a crystal-like substance. She performed a field test on one of the bags, which presumptively tested positive for methamphetamine. She also found some syringes and mail addressed to the defendants at the 21st Street address in Collinsville.

**C.      Criminal History**

Agent Winter then performed records checks on both defendants. She testified that, from those checks, she determined that Mr. Holt is a member of the Cherokee Nation and has a criminal history, and that Ms. Harrington is not a member of a tribe. In her Cherokee Nation Affidavit, Agent Winter noted that Mr. Holt had "prior charges from multiple states, including Oklahoma, Texas, and Missouri involving weapons, and the possession of controlled dangerous substances." (Doc. 67-1, p. 4). She specifically identified only two prior convictions: a 1989 Texas charge for the "ILLEGAL TRANSFER OF MACHINE GUN" and 2017 charges in Tulsa County for "Unlawful Possession of Controlled Dangerous Drug with Intent to Distribute Methamphetamine, Carry Firearms after Conviction/During Probation, Possession of a Controlled Dangerous Substance, and Possession of Paraphernalia," to which Mr. Holt had entered guilty pleas. *Id.*

###### D.    The Search Warrant Affidavits

On August 23, 2023, Agent Winter submitted identical Affidavits for Search Warrants to Cherokee Nation Tribal Court and Tulsa County District Court. In the Affidavits, Agent Winter sought to search Mr. Holt's residence for evidence of the distribution of controlled dangerous substances. (Doc. 67-1, at p.4). Mr. Holt was the subject of, and listed as the target "Defendant" in, both Affidavits. (*See* Docs. 67-1, 67-2).

The Cherokee Nation Warrant was signed and issued by a Cherokee Nation Judge on the same day. However, Agent Winter testified that the Tulsa County Judge required more details regarding the GPS tracker and additional information, such that Agent Winter had to submit two additional versions of the Affidavit before the Tulsa County Judge issued a search warrant the following day, on August 24, 2023.

###### i.    The Cherokee Nation Affidavit

In the Cherokee Nation Affidavit (and the identical, first Affidavit submitted to Tulsa County), under the "Probable Cause" section, Agent Winter first wrote the following:

> In the month of June 2023, Oklahoma Bureau of Narcotics Agents had a GPS tracking device attached to a vehicle of a known distributor of methamphetamine. Based on the GPS tracker data, investigators developed this location, **117 N 21st St in Collinsville, Tulsa, County, Oklahoma 74021**, as a possible target source of supply for methamphetamine.

(Doc. 67-1, at p. 2) (emphasis in original).

Neither Mr. Leach nor the CI are mentioned in this Affidavit. There is no information regarding the OBN's use of the CI to purchase methamphetamine from Mr. Leach or the CI's contention that Mr. Leach was going to meet his dealer and the dealer was "up the hill." There was no explanation of the meaning of "up the hill." Agent Winter

also omitted evidence that the vaguely referenced GPS tracker data was obtained pursuant to a warrant. She did not include that Mr. Leach travelled to the address at issue for short durations nine times during June and July of 2023, and failed to identify *any fact* from the GPS data that involved the targeted residence or either of the defendants.

Agent Winter next wrote that her records check identified the residence at issue "to be the residence of LEE HOLT." (Doc. 67-1, p. 2). She also determined that the residence was "within Tulsa County, based on Tulsa County Assessor's online records." *Id*. Her records check also revealed Mr. Holt's criminal history, which she summarized follows:

> Through a records check, Investigators confirmed Lee Holt is a convicted felon. Holt has prior charges from multiple states, including Oklahoma, Texas, and Missouri involving weapons, and the possession of controlled dangerous substances. As early as 1989, Holt plead guilty to the "ILLEGAL TRANSFER OF MACHINE GUN" in the State of Texas. In 2017 through Tulsa County, Oklahoma, Holt was charged with Unlawful Possession of Controlled Dangerous Drug with Intent to Distribute Methamphetamine, Carry Firearms after Conviction/During Probation, Possession of a Controlled Dangerous Substance, and Possession of Paraphernalia (plead guilty in 2019- Tulsa County Case # CF-2017-3457.)

(Doc. 67-1, p. 4).

The Cherokee Nation Affidavit also included findings from the August 21, 2023, trash pull, summarized as follows:

> On August 21, 2023, Oklahoma Bureau of Narcotics Agents Tara Winter and Jodi Willingham conducted a trash pull at a residence **117 N. 21st Street in Collinsville, Tulsa County, OK 74021**.
>
> ***
>
> Agents observed that the trash had been placed next to the curb for collection. Agent Winter and Agent Willingham found the following items of evidentiary value within the refuse:

--Two plastic baggies that contained a residue of a crystal-like substance that field tested positive for methamphetamine. One baggie was field tested (pictured below). Both baggies were sealed to be submitted to the OSBI lab for further chemical analysis.

--Syringes (*In your affiants training and experience, this is a common way to ingest a controlled dangerous substance.*) (Items were photographed.)

--Pieces of mail addressed to "Lee Holt at 117 N 21st St Collinsville, OK 74021" and "Jennifer Harrington at 117 N 21st St Collinsville, OK 74021". (Items were photographed.)

(Doc. 67-1, p. 3-4) (emphasis in original). The pictures showed one small Ziploc bag with a blue and white field test, approximately five or six syringes, and mail addressed to each of the defendants at that address. *Id*.

Agent Winter concluded that, "[b]ased off all the evidence collected in this investigation, I believe illegal controlled substances are being sold and housed at the residence." (*Id*. at p. 4). She stated further, "I believe[] that there is ongoing criminal activity at the residence to be searched and the ongoing criminal activity is in reference to the **DISTRIBUTION OF A CONTROLLED SUBSTANCE** from the residence at **117 N 21st Street Collinsville, OK in Tulsa County.**" (*Id*. at p. 4) (emphasis in original).

### ii.    The Tulsa County Affidavit

The third Affidavit that Agent Winter submitted to Tulsa County, which the Tulsa County Judge ultimately accepted, differs significantly from the Cherokee Nation Affidavit. (*Compare* Doc. 67-1 and 67-2 "Probable Cause" section). In addition to the information contained in the Cherokee Nation Affidavit, the third Affidavit submitted to Tulsa County contained the following paragraphs:

7

In the month of June 2023, Oklahoma Bureau of Narcotics Agents began an investigation involving Michael Leach of Claremore, Oklahoma for distributing methamphetamine. OBN Agents utilized a confidential informant to purchase methamphetamine from Leach on two occasions in June and July of 2023.

Leach described to the informant that the location of his source was "up the hill". Keetonville Hill is a known landmark in the area on Highway 20 between the Claremore and Collinsville areas. On June 27, 2023 OBN Agents attached a GPS tracking device to the vehicle of Michael Leach. Tracker data indicated that Leach travelled to Collinsville, specifically to the address of 117 N. 21st Street, approximately 9 times for short durations of time in the month of July 2023, between the 3rd and the 25th. On each of these occasions, Leach's vehicle traveled west on Highway 20 up Keetonville Hill. This is the only location in Collinsville, Tulsa County, OK that Leach traveled to.

On July 17th 2023 Oklahoma Bureau of Narcotics Agent McClaren received information from a source of information that Leach was going to pick up from Leach's source that evening. GPS tracker data showed Leach's vehicle travel to the location of 117 N. 21st St, on July 17th 2023. On July 17, 2023 Agent McClaren observed Leach exit his vehicle on the return trip from Collinsville at the QuikTrip located at 169 and Highway 20 and return shortly thereafter. Agent McClaren further observed Leach travel down Keetonville hill on Highway 20 and return to the Motel 6 (location Leach was staying in Claremore, OK) in Claremore, Oklahoma. Based on the information supplied by the informant about where Leach's source was located, the information on July 17th, 2023, and the GPS tracker data, investigators developed this location, **117 N 21st St in Collinsville, Tulsa, County, OK 74021**, as a possible target source of supply for methamphetamine.

(Doc. 67-2, p. 50) (emphasis in original). Agent Winter also added the following highlighted and bolded language to the Affidavit:

Your Affiant, Agent Winter has authored and received authorization securing a tribal search warrant from Cherokee Nation presiding District Court Judge T. Luke Barteaux on August 23rd, 2023.

(Doc. 67-2, p. 50) (emphasis omitted). The Tulsa County Warrant was issued on August 24, 2023.

### E.    The Search of the Residence

After obtaining the warrants days before, Agent Winter conducted a search of the residence on August 29, 2023. The search resulted in the seizure of over 100 grams of methamphetamine, a Rossi firearm, alleged drug proceeds, and scales. Immediately after the search, the seized evidence was transported to the OBN. The drug-related evidence was given to the United States Drug Enforcement Administration (DEA) the following day, August 30, 2023. No federal agency was involved in the investigation up until that point. The firearm remained with the OBN.

Agent Winter testified that Agent McClaren filed the return for the Cherokee Nation Warrant, but a return was not filed for the Tulsa County Warrant. She could not explain why a return was not filed in Tulsa County. It was unclear whether the Tulsa County Warrant was served or whether the search was purportedly executed in reliance on that Warrant, in addition to the Cherokee Nation Warrant.

### F.    Procedural History

On March 19, 2024, the grand jury returned a five-count Superseding Indictment (Doc. 47) for the defendants. The defendants are charged with being Felons in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (Counts One and Two); Possession of Methamphetamine with Intent to Distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii) (Count Three); Maintaining a Drug-Involved Premises, in violation of 21 U.S.C. §§ 856(a)(1) and 856(b) (Count Four); and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Five).

In his Motion to Suppress, Mr. Holt requests that the Court suppress all evidence recovered from the residence as a result of the search. (*See* Doc. 67). Mr. Holt argues that the Cherokee Nation Warrant lacked probable cause, and the Tulsa County Warrant was not valid against him under *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020). The plaintiff argued that the Cherokee Nation Affidavit established probable cause for the search, but even if it did not, the good faith exception to the exclusionary rule should be applied. (*See* Doc. 67).

At the conclusion of the May 21, 2024 hearing, the plaintiff's counsel indicated that the issue for the Court on Mr. Holt's suppression motion is whether the Cherokee Nation Warrant was supported by probable cause. Specifically, the plaintiff's counsel indicated that the Tulsa County search warrant would not be validly executed upon Mr. Holt's residence. This Report and Recommendation is accordingly limited to the issue of whether the Cherokee Nation Warrant was supported by probable cause and, if not, whether the good faith exception applies.

## III.   Discussion

### A.   Legal Standards Governing Warrants

"The common law maxim 'every man's house is his castle' is part of our Fourth Amendment jurisprudence prohibiting unreasonable searches and seizures." *United States v. Gay*, 240 F.3d 1222, 1226 (10th Cir. 2001) (citing *Payton v. New York*, 445 U.S. 573, 597, n.45 (1980)). The Fourth Amendment guarantees citizens the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The purpose of the Fourth Amendment is to guard against

10

arbitrary governmental invasions of the home. *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012) (citing *Payton*, 445 U.S. at 582 n. 17).

For a warrant to be valid, it must be supported by probable cause and "particularly describ[e] . . . the persons or things to be seized." *United States v. Leary*, 846 F.2d 592, 600, 605 (10th Cir. 1988) (alteration in original). Probable cause requires that "the supporting affidavit must provide a substantial basis to conclude that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Alqahtani*, 73 F.4th 835, 842 (10th Cir. 2023) (alteration omitted). While a "fair probability" must exist, establishing probable cause "does not demand all possible precision." *Herring v. United States*, 555 U.S. 135, 139 (2009).

A warrant application must also establish "a nexus" between the material to be seized or suspected criminal activity and the place to be searched. *United States v. Rowland*, 145 F.3d 1194, 1203 (10th Cir. 1998); *United States v. Roach*, 582 F.3d 1192, 1200 (10th Cir. 2009) (citations omitted) ("The affidavit must show a 'nexus between . . . suspected criminal activity and the place to be searched,'. . . and a court may not 'arrive at probable cause simply by piling hunch upon hunch.'"). A nexus is established when the supporting "'affidavit describes circumstances which would warrant a person of reasonable caution' in the belief that 'the articles sought' are at a particular place." *United States v. Biglow*, 562 F.3d 1272, 1279 (10th Cir. 2009) (internal citation omitted). "Probable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime. Instead, there must be additional evidence linking the person's home to the suspected criminal activity." *Rowland*, 145 F.3d at 1204.

"Although reviewing courts should afford a magistrate's probable cause decision great deference," a reviewing court will not defer if there is no 'substantial basis for concluding that probable cause existed.'" *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000) (citing *Rowland*, 145 F.3d at 1204 (quotations omitted). If a warrant "was not supported by probable cause or no nexus is established, the exclusion of the seized evidence from trial proceedings may be required." *United States v. Crockett*, 2023 WL 8697835, *1 (D. Kan. Dec. 15, 2023) (citing *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

### B.     The Alleged Bases for a Finding of Probable Cause

The Cherokee Nation warrant affidavit was based upon three cited factual bases: a vague, factually unsupported reference to GPS tracking data, Mr. Holt's criminal history, and the trash pull, which located evidence of methamphetamine residue and five or six syringes, indicative of personal drug use. Each is discussed more specifically below.

### i.     GPS Tracking Data

The Cherokee Nation Affidavit only vaguely suggests that in June of 2023, the OBN attached a tracker to the "vehicle of a known distributor of methamphetamine" and based on the tracker data, "investigators developed [the defendants' address] as a possible target source of supply for methamphetamine." (Doc. 67-1, at p. 2). These statements are entirely conclusory and lack *any* corroborating factual information. Glaringly missing from the Affidavit is any information regarding: (1) whether the GPS tracker was placed pursuant to a warrant; (2) whose vehicle the tracker was attached to; (3) how the OBN knew the operator of the vehicle was supposedly a "known distributor of methamphetamine"; (4)

how long the tracker was on the vehicle;  (5) what information was gleaned from the GPS tracker; (6) how or why the specific address at issue was "developed" from the tracker data; (7) whether, how often, and for how long the vehicle visited the targeted address; and (8) how or why the address was identified as a "possible target source of supply for methamphetamine." *See id*.

Neither Mr. Leach nor the CI are mentioned in the Affidavit whatsoever. *See id.*. There is no information regarding the OBN's use of the CI to purchase methamphetamine from Mr. Leach, that Mr. Leach was connected to either of the defendants, or the CI's statements that Mr. Leach was going to meet his dealer or the dealer was "up the hill."[2]

Notably, the CI's alleged statements that Mr. Leach said he was going to meet with his source and his source was "up the hill" are the only evidence allegedly tying the residence to ***suspected drug distribution***. Yet, this information is absent from the CN Affidavit, such that there is no "nexus" between the suspected criminal activity ("distribution" and "sales" of controlled substances, as was repeatedly alleged in the Affidavit, *see* Doc. 67-1 at 2, 4, 5) and the residence.[3] The Tulsa County Judge's rejection

---

[2]     In any event, the reference to "up the hill" is so vague that it, alone, would not have established probable cause even had it been included in the Cherokee Nation Affidavit. Aside from the plaintiff's argument that "up the hill" referred to Keetonville Hill, not the defendants' residence in Collinsville, the government provided no factual information supporting any inference that is what was meant by Mr. Leach or the CI. The plaintiff's counsel also argued at the hearing that the phrase "up the hill" equated to *west of Collinsville*, which is inconsistent with the physical location of Keetonville Hill.

[3]     The plaintiff apparently recognized that the Cherokee Nation Affidavit's vague reference to the tracker data and known distributor is not helpful to the probable cause analysis, as the plaintiff argued at the hearing that "[o]nce we had that trash pull with the

of an identical Affidavit and her request for additional information related to the GPS tracker data further support the conclusion that there was no substantial basis for finding probable cause on the conclusory allegations regarding the tracker and any allegedly known methamphetamine distributor.

### ii.    Criminal History

In the Cherokee Nation Affidavit, Agent Winter identified the 1989 Texas machine gun charge and 2017 charges in Tulsa County, which included a methamphetamine distribution charge, to which Mr. Holt pleaded guilty.  (Doc. 67-1, p. 4).

"Criminal history alone is not enough to support a finding even of reasonable suspicion, much less probable cause." *United States v. Artez*, 389 F.3d 1106, 1114 (10th Cir. 2004) (citing *United States v. Sandoval,* 29 F.3d 537, 542 (10th Cir. 1994)). "However, criminal history, combined with other factors, can support a finding of reasonable suspicion or probable cause." *Id.* at 1114 (citing *United States v. West*, 219 F.3d 1171, 1179 (10th Cir. 2000); *United States v. Myers*, 106 F.3d 936, 939 (10th Cir. 1997); *United States v. McCranie*, 703 F.2d 1213, 1218 (10th Cir. 1983)).

"[P]robable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched." *United States v. Roach*, 582 F.3d 1192, 1201 (10th Cir. 2009) (quoting *United States v. Mathis*, 357 F.3d 1200, 1206–07 (10th Cir. 2004)). "[W]hether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the

---

two bags of meth, the syringes, and then Mr. Holt's criminal history, the Cherokee Nation warrant had ample probable cause to be issued."

nature of the property to be seized." *Id*. at 1201 (citing *Mathis*, 357 F.3d at 1207). "As is only logical, 'ongoing and continuous activity makes the passage of time less critical when judging the staleness of information upon which a search warrant is based,' because evidence of a longstanding pattern of repeated activity makes it less likely that the activity has ceased within a short time frame." *Id*. (citing *Mathis*, 357 F.3d at 1207).

In *Roach*, the defendant moved to suppress evidence seized during the search of his girlfriend's residence, arguing that the affidavit for search warrant relied on stale evidence of his prior gang-related activity. "[T]he most recent indication of gang-related criminal activity was some *five years* before issuance of the warrant." *Id*. at 1201. In addition, the defendant admitted to police that he lived a gang "lifestyle" approximately one and a half years before the warrant was issued. *Id*. at 1197. The Tenth Circuit held that the five-year-old evidence was not refreshed by the defendant's subsequent admission. *Id*. at 1201-02. The court explained:

> We recognize that "[t]he determination of whether information is stale depends on the nature of the crime and the length of criminal activity, not simply the number of days that have elapsed between the facts relied upon and the issuance of the warrant." *United States v. Basham*, 268 F.3d 1199, 1206 (10th Cir.2001). But it would stretch this rule beyond its breaking point to conclude that an isolated statement, occurring one and a half years before issuance of the warrant, is evidence that a prior course of criminal conduct is ongoing. See *United States v. Prideaux–Wentz,* 543 F.3d 954, 958–59 (7th Cir.2008) (evidence of possession of child pornography that was at least four years old was too stale to support a warrant); *United States v. Howard*, 532 F.3d 755, 759 n. 5 (8th Cir. 2008) ("[E]vidence of a one-and-a-half year old conviction, standing alone, might be considered stale."); *United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003) ("[T]he information regarding the medallion may have been stale because it was unlikely that Wright would have possession of such an item three years after the crime."); *United States v. Zimmerman*, 277 F.3d 426, 435–36 (3d Cir. 2002) (evidence that informants viewed child pornography at a suspect's house six months earlier

was too stale to support a warrant). ***This is particularly so considering that firearm and drug trafficking are not the sorts of crimes whose evidence is likely to remain stationary for years at a time.***

*Id*. at 1202 (emphasis added). Because the alleged criminal and gang history was stale, the Tenth Circuit "conclude[d] that the warrant did not set forth probable cause to search [the defendant's residence]." *Id*.[4]

In *United States v. Brown*, the court held that an eight-year-old juvenile conviction for the possession of marijuana was stale and not sufficient to find probable cause for the search of a residence for evidence of drug trafficking. 586 F.Supp.3d 1075, 1085 (D. Kan. Feb. 16, 2022). The government argued that the conviction, combined with evidence obtained from two trash pulls, was sufficient to show probable cause, "but it [did] not cite to any authority that would support this position." *Id*. The trash pulls revealed small amounts of marijuana consistent with personal use. *Id*. at 1081. The court explained that "the isolated juvenile conviction is too stale to be refreshed by the trash pulls that occurred several years later." *Id*. at 1085.[5]

Considering the applicable legal standards, it is clear that the evidence of Mr. Holt's 1989 Texas conviction is too stale to support a finding of probable cause. First, the conviction occurred approximately 34 years prior to the issuance of the Cherokee Nation

---

[4]    The court ultimately upheld the district court's denial of the motion to suppress based on the good faith exception. *See id.* at 1204-05.

[5]    Although the court found that the conviction was stale and the warrant for the search of the residence was not supported by probable cause, the court ultimately found that the officers acted in good faith and denied the suppression motion. *Id.* at 1093.

Warrant. Such remote conduct cannot form the basis of probable cause to issue a search warrant for Mr. Holt's residence for evidence of suspected drug distribution in 2023.

Mr. Holt's 2017 charges and subsequent guilty plea in Tulsa County occurred approximately six years prior to Agent Winter presenting the Affidavit to the Cherokee Nation Judge. Although the charges consisted of drug related crimes, including the possession of methamphetamine with intent to distribute, the plaintiff presented no evidence in the Cherokee Nation Affidavit that the distribution activity was continuing or ongoing during the previous six years. As the Tenth Circuit has noted, evidence of drug trafficking crimes is not likely to remain stationary for years at a time, such that the evidence relating to the 2017 charges would not indicate "that the items sought [would] be found in the place to be searched," and there was accordingly no probable cause for the Cherokee Nation Warrant. *See Roach*, 582 F.3d at 1201.

Moreover, Agent Winter provided no context in the Cherokee Nation Affidavit in terms of what led the OBN to suspect drug *distribution* at the residence in 2023. Given the passage of several years, there was not a substantial basis for finding probable cause supported the Cherokee Nation Warrant. *Roach*, 582 F.3d at 1202; *cf. Mathis*, 357 F.3d 1200 (holding that evidence from cooperating witnesses that was two years old was not stale where "observations by various witnesses continued through" the two years); *United States v. Iiland*, 254 F.3d 1264, 1269 (10th Cir. 2001) (activities occurring three months before the warrant was obtained were not stale where there were facts demonstrating "that the alleged drug trafficking activity was ongoing over a considerable period of time"); *United States v. Reyes*, 798 F.2d 380, 382 (10th Cir. 1986) (evidence of five-month-old

drug transaction was not stale where there were allegations of "repeated drug offenses at several month intervals").[6]

### iii.   The Trash Pull

As discussed *supra*, the August 21, 2023, trash pull at the residence revealed two small plastic bags containing residue of a crystal-like substance, one of which presumptively tested positive for methamphetamine on a field test. Agent Winter also found a number of syringes and mail addressed to and bearing the names of the defendants. The defendants argue that these findings do not indicate that they were distributing methamphetamine; at most, they evidence only personal drug use by someone with access to the trash that was put at the curb.

The plaintiff cites *United States v. Colonna*, 360 F.3d 1169 (10th Cir. 2004) (overruled on other grounds by *United States v. Little*, 829 F.3d 1177 (10th Cir. 2016)) and *United States v. Jenkins*, 819 Fed. Appx. 651 (10th Cir. 2020) in support of its argument that a bag of methamphetamine from a trash pull coupled with a defendant's criminal history is sufficient to establish probable cause. In *Colonna*, officers performed a trash pull at the defendant's residence and found "two burnt roach ends of suspected marijuana cigarettes, a 'twist' torn from the corner of a plastic baggie, a plastic baggie with a corner torn from it, and an empty container of Zig Zag cigarette papers." 360 F.3d 1173. The defendant argued that this evidence only showed "personal use of marijuana by someone

---

[6]     There is no evidence provided in the Cherokee Nation Affidavit that linked either of the defendants in this case to continuous drug distribution or use over the six years following the most recent of Mr. Holt's referenced convictions.

in the residence, and that personal use alone does not justify the search of a home." *Id*. at 1175. The court rejected the argument, noting that all that is required for a valid search warrant is "a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L.Ed.2d 527 (1983)).

However, the court in *Colonna* recognized that the Affidavit attached to the warrant application "articulat[ed the officer's] basis for believing that Mr. Colonna was using his home as a drug distribution center." *Id*. at 1172. Specifically, the affidavit noted additional facts alleged to support probable:

> ¶ 10: Deputy Heinz Kopp told Deputy Weidmer that Mr. Colonna—whom Deputy Weidmer knew was a convicted felon—had bragged to Deputy Kopp about owning a handgun.
>
> ¶ 11: Deputy Weidmer saw Mr. Colonna covertly watching an unrelated drug bust in West Valley City in a manner that suggested that Mr. Colonna himself had something at stake in the drug bust.
>
> ¶ 12: A confidential informant (CI# 2) told Deputy Joel Knighton, who had previously received reliable information from CI# 2, that CI# 2 had watched Mr. Colonna make a drug delivery in Kearns, Utah.
>
> ¶ 13: Deputy Weidmer observed four men in a car waiting outside Mr. Colonna's home for several minutes. The men were led into Mr. Colonna's house after being met by him in his yard, after Colonna looked over his fence and up and down the street.
>
> ***
>
> ¶ 17: Mr. Colonna had been arrested twenty-four times in Salt Lake City for various offenses and been convicted of two felonies.

*Id*. at 1172-73. Thus, the *Colonna* affidavit provided some additional facts tying the alleged residence to suspected drug distribution. Such facts were not present in the Cherokee Nation Affidavit at issue here, which did not mention the CI or Mr. Leach whatsoever and

which provided no details or corroborating evidence related to any GPS tracker data. Without any explanation as to what led the OBN to the residence at issue, Agent Winter's Cherokee Nation Affidavit failed to establish a nexus between the suspected criminal activity (drug distribution) and the residence.

In the more recent case upon which the plaintiff relies, the defendant moved to suppress evidence seized from his residence during the execution of a search warrant. *Jenkins*, 819 F. Appx. 651. In that case, the officer performed a single trash pull, which revealed "[a] small Ziploc bag with residue field testing positive for methamphetamine." *Id*. at 654. A search warrant was served for a residence based on an affidavit that recited a tip from a confidential informant the month before and an arrest just months earlier for possession of methamphetamine, over 1000 pills containing controlled substances, a small amount of marijuana, a digital scale, and loaded .45 caliber handguns, for which the defendant's prosecution was still ongoing. *Id*. at 660. Thus, there was evidence in *Jenkins* of the defendant's recent and continuing involvement in drug distribution. Such evidence is not present in the Cherokee Nation Affidavit.

The *Jenkins* court noted that courts in recent cases outside of the Circuit determined that more than a single trash pull is necessary to establish probable cause where only a small quantity of drugs is found. *Id*. at 660-61. However, *Jenkins* ultimately concluded that the Ziploc bag with meth residue from the single trash pull, coupled with the defendant's ongoing drug prosecutions, was sufficient to support a finding of probable cause. *Id*. The court explained:

[S]ome recent cases have reasoned that more than a single trash pull is needed to support probable cause, particularly when the trash pull uncovers a small quantity of drugs. For instance, in *United States v. Abernathy*, 843 F.3d 243, 248 (6th Cir. 2016), the probable-cause affidavit omitted the defendant's criminal history, even though the "Defendant had a lengthy history of drug and weapons charges[.]" Unable to rely on this "critical missing ingredient," the court ruled that, standing alone, a single trash pull that uncovered evidence of marijuana use was insufficient to support probable cause for a search warrant. *Id*. at 255–57 (emphasis added) (citation omitted).

But *Abernath*y's critical ingredient is present and potent here: Sergeant Harmon's affidavit underscored that the State of Oklahoma was currently prosecuting Jenkins for serious drug-related crimes. Mixed together, Jenkins's ongoing drug prosecution augmented the probable-cause value of the methamphetamine residue. Remaining mindful that we must defer to the issuing-judge's probable-cause conclusion "even in a 'doubtful or marginal case,' " *Pulliam*, 748 F.3d at 971 (citation omitted), we hold that Jenkins's ongoing drug-related prosecution and the trash-pull evidence, when combined together, supplied probable cause to believe that evidence of drug use or drug possession would be found at the Wilshire residence.

*Id*.

Although both *Jenkins* and this case involve single trash pulls that evidence drug use in the residence, this case is missing "*Abernathy's* critical ingredient." *Id*. Unlike *Jenkins*' ongoing prosecution, which was based on evidence of *recent* drug distribution, as well as an informant's tip of drug distribution, Mr. Holt's cited criminal history was 34 years and 6 years prior and thus clearly was stale.

Based on the foregoing, the plaintiff's case law is distinguishable from the facts of this case. Both *Colonna* and *Jenkins* involved non-stale evidence that supported a finding of probable cause to believe evidence of drug distribution would be found in the residence. *Colonna* involved an informant who allegedly witnessed the defendant make a drug delivery, as well as other facts. In *Jenkins*, there was evidence of ongoing drug distribution

activity and current prosecution based on that activity. The single trash pull in this case, which revealed, at most, evidence of personal drug use, was not bolstered by any recent, non-stale factual evidence regarding drug distribution in the Cherokee Nation Affidavit.

Based on the foregoing, the undersigned recommends a finding that the single trash pull in this case did not establish probable cause for the search of the defendants' residence. To find otherwise would legally permit law enforcement to search nearly every citizen's discarded trash, without a warrant or probable cause, and then obtain a warrant for the search of a residence based only on evidence of personal drug use found in that trash.

### iv.    The Cherokee Nation Warrant Lacked Probable Cause

As noted herein, the undersigned finds that the GPS tracker data was too vague and lacking in a single factual detail that would support probable cause, the referenced 1989 and 2017 criminal activity history relating to Mr. Holt was too stale to support probable cause, and the single trash pull indicative only of personal drug use is not sufficient on the facts presented to support a finding of probable cause for the warrant. The plaintiff has not cited any case in this Circuit where there was *only* evidence of a single trash pull with evidence of personal use supporting probable cause; its cited cases involved more factual support than the affidavit in this case. The Court thus recommends that the Chief District Judge find that the warrant affidavit lacked probable cause for issuance of the search warrant.

### C.    The Good Faith Exception

"Under the good-faith exception to the exclusionary rule, if a warrant is not supported by probable cause, the evidence seized pursuant to the warrant need not be

22

suppressed if the executing officer acted with an objective good-faith belief that the warrant was properly issued by a neutral magistrate." *United States v. Pulsifer*, 588 Fed. Appx. 800, 803 (10th Cir. 2014) (citing *United States v. Augustine*, 742 F.3d 1258, 1262 (10th Cir.), cert. denied, 572 U.S. 1108 (2014); *see also United States v. Quezada–Enriquez*, 567 F.3d 1228, 1234 (10th Cir. 2009) ("We will not reverse the district court's decision to deny suppression of the evidence obtained during a search if the officers who executed the warrant relied upon it in good faith."). "When officers rely on a warrant, we presume they acted in objective good faith." *Id.* (citing *Augustine*, 742 F.3d at 1262; *see Messerschmidt v. Millender*, 565 U.S. 535 (2012) (citing *United States v. Leon*, 468 U.S. 897 (1984) ("[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in objective good faith."). "However, this presumption is not absolute." *Augustine*, 742 F.3d at 1262.

In *Leon*, the Supreme Court identified four situations in which an officer would not have reasonable justification for believing a warrant was properly issued. 468 U.S. at 922–23. As explained by the Tenth Circuit:

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth." Second, the exception does not apply when "the issuing magistrate wholly abandon[s] her judicial role." Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

*Danhauer*, 229 F.3d at 1007 (citing *Leon*, 468 U.S. at 923).

23

"In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination because it is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Messerschmidt*, 565 U.S. at 547 (internal citation, alterations, and quotation marks omitted). Thus, "[t]he test to determine whether the court should apply the 'good faith' exception 'is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Beck,* 139 Fed. Appx. 950, 955 (10th Cir. 2005) (citing *Leon* at 468 U.S. 922). "[L]aw enforcement officials are presumed to have a reasonable knowledge of the law." *United States v. Gonzales*, 399 F.3d 1225 (10th Cir. 2005). "[T]he government, not the defendant, bears the burden of proving that its agents' reliance upon the warrant was objectively reasonable." *United States v. Cook,* 854 F.2d 371, 372 (10th Cir. 1988).

"[A] suppression court's assessment of an officer's good faith is confined to reviewing the four corners of the sworn affidavit and any other pertinent information actually shared with the issuing judge under oath prior to the issuance of the warrant, as well as information relating to the warrant application process." *United States v. Knox*, 883 F.3d 1262, 1272 (10th Cir. 2018).  "We therefore confine our good-faith inquiry in this case to whether the affidavit itself is sufficiently detailed to merit application of the good-faith exception to the warrant requirement." *Id*. at 1273.

Here, the evidence as to Agent Winter's good faith reliance upon the Cherokee Nation warrant is somewhat mixed. The defendants argue that Agent Winter could not have

24

relied upon the Cherokee Nation warrant in good faith because, prior to the search of the defendants' residence, Agent Winter knew that the Tulsa County judge had requested additional information be added to the identical affidavit submitted the same day. In addition, the Court has noted that the Cherokee Nation affidavit lacked any factual detail whatsoever of what led the OBN to suspect drug distribution activity at the defendants' residence.

However, there is no evidence that Agent Winter presented false or misleading information or that she lacked a good-faith belief that the warrant was properly issued by a neutral Cherokee Nation judge. She submitted the warrant applications to the tribal and state courts on the same day, and she received the warrant issued by the tribal court that day. While the state court judge requested more information before issuing a warrant the following day, it was objectively reasonable for Agent Winter to rely upon two warrants that she obtained from two different judges to "cover her bases" for the residence of one occupant with tribal citizenship and one without, especially where no federal law enforcement officers were involved at that point.

In addition, given the state of the law, including some Tenth Circuit authorities that a single trash pull indicative of personal drug use by a targeted defendant, combined with a resident's criminal history, can provide probable cause for a residential search, Agent Winter had reason to believe that the trash pull and Mr. Holt's history, including a 2019 drug trafficking conviction and multi-state history of criminal charges, properly supported the Cherokee Nation judge's issuance of the search warrant. While the undersigned has found that the warrant affidavit lacked probable cause, Agent Winter's reliance on the

warrant – which was issued on the affidavit citing both Mr. Holt's drug trafficking history (albeit aged) and the evidence of methamphetamine present in the trash pull – appears to have been in good faith under the specific circumstances in this case.

Even in the cases relied upon in this Report and Recommendation for a finding of a lack of probable cause, many of the courts found that the good faith exception applied. For example, in *Roach*, 582 F.3d at 1203-04, the Tenth Circuit found that the officer acted in good faith despite relying on stale information in the warrant. Similarly, in *Brown*, the court held the officer relied in good faith on the warrant, despite the affidavit's reliance upon a stale conviction. 586 F.Supp.3d at 1093. In applying *Leon*'s good faith exception to the exclusionary rule and denying the motion to suppress despite the finding of a lack of probable cause for the warrant, the *Brown* court noted as follows:

> This outcome is entirely consistent with the Supreme Court's admonition that the purpose of suppression is to deter the police from future unlawful conduct, and to provide a disincentive and deterrent effect against future Fourth Amendment violations. There is absolutely no indication that law enforcement officers in this case did anything sufficiently nefarious to warrant the high societal cost of suppressing relevant evidence. At most, this was a case where the officer simply failed to include enough of the relevant information of which he was aware to meet the threshold for probable cause on the face of the warrant affidavit. In spite of that, the affidavit was sufficient for good faith. That is enough.

*Id.* For similar reasons here, the undersigned recommends a finding that the good faith exception applies in this case.

### D.     Alleged Violation of Rule 41(b)(1)

Fed. R. Crim. P. 41 establishes where and how to apply for a warrant that is federal in character. *United States v. Krueger*, 809 F.3d 1109, 1112 (10th Cir. 2015). Rule 41(b)(1), which governs "Venue for a Warrant Application," requires that a "federal law enforcement officer" or "attorney for the government"  seeking a warrant apply to a "magistrate judge with authority in the district" where property or persons to be searched or seized is located "or if none is reasonably available," a state court judge in the district. Where Rule 41(b)(1) is violated, suppression is warranted only if the rule violation was intentional, prejudicial, or of "constitutional import." *Krueger*, 809 F.3d at 1113–14. Prejudice is defined in the Rule 41(b)(1) context as a showing that the search might not have occurred but for the violation or would not have been "so abrasive" had the Rule been followed. *Id.* at 1115.

Rule 41(b)(1) is not implicated when a search warrant is of state, rather than federal, character. A search warrant request retains its state character when it was requested by a state law enforcement officer, was issued by a state judge, its execution was planned and carried out by state officers, and there is no evidence that a federal prosecution was envisioned at the time of the search. *United States v. Sadlowski*, 948 F.3d 1200, 1204 (10th Cir. 2020) (citing *United States v. Barrett*, 496 F.3d 1079, 1090–91 (10th Cir. 2007)).

As the plaintiff presented at the hearing, the investigation was carried out by the OBN, a state agency. Agent Winter testified that no federal agents participated in the search. Agent Winter, Agent McClaren, and Agent Willingham are state law enforcement

officers with the OBN and are not cross deputized with the federal government. Moreover, the Cherokee Nation Warrant was issued by a tribal judge with jurisdiction.

However, as to whether a federal prosecution was envisioned at the time of the search, the evidence is mixed. Agent Winter noted in the Affidavits that "[a]gents verified that Lee Holt is in fact a member of a recognized tribe, Cherokee Nation." (Docs. 67-1, p. 4; 67-2, p. 5) (emphasis omitted).  The OBN's investigation began in June of 2023, nearly three years after the Supreme Court issued its ruling in *McGirt v. Oklahoma,* 591 U.S. ---, 140 S. Ct. 2452 (2020). Agent Winter testified that she was not sure at the time of the investigation where the case would be prosecuted. The case was ultimately submitted to Homeland Security Investigations for federal prosecution after the evidence of drug distribution was found at the residence, and the day after the search, the drug-related evidence was provided to the United States Drug Enforcement Agency. While there is evidence of federal involvement in this prosecution *after* execution of the search warrant, the only record evidence on this point – which is the testimony of Agent Winter – is unequivocal that there was not any federal involvement in the investigation prior to the execution of the search at the defendants' residence.

The plaintiff relies on *United States v. Bookout* in support of its argument that a warrant retains its state character where federal agents do not participate in the investigation or search. 810 F.2d 965 (10th Cir. 1987). Although *Bookout* involved a federal officer conveying information gained in his official capacity to state officers, a state magistrate judge ultimately issued the search warrant that was executed by the state and local officers. *Id*. at 966. The return was filed in state court. *Id*. The seized evidence was

maintained by the state, and a state criminal complaint was filed against the defendant for various state drug offenses. *Id*. A federal criminal indictment was not issued until more than one year later. *Id*.

While the present case is different from *Bookout* in some respects, it is similar in others when considering evidence of whether the search warrant was federal in character. Specifically, similar to the facts in *Bookout*, the evidence here indicates that there was no federal law enforcement involvement during the OBN investigation prior to the search, and no federal indictment was returned against these defendants until approximately six months after the execution of the search warrant. Also, in *Sadlowski*, the Tenth Circuit determined that a search was not sufficiently federal in character to mandate application of Fed. R. Crim. P. 41 even though federal agents participated in execution of the residential search warrant and a federal prosecution was ultimately initiated. 948 F.3d at 1204. Based on the foregoing, the Court recommends findings that the search was not federal in character and that Rule 41(b)(1) was not violated.

Even if the search warrant had been federal in character, where a Rule 41(b) violation occurs, suppression is only warranted if the violation was deliberate, prejudicial, or of "constitutional import." *Krueger*, 809 F.3d at 1113–14. Prejudice is defined in the Rule 41(b)(1) context as "a showing that the search might not have occurred but for the violation or would not have been 'so abrasive' had the Rule been followed." *United States v. Crockett,* 2023 WL 8697835 (D. Kan. Dec. 15, 2023) (citing *Krueger*, 809 F.3d at 1115). The evidence presented here does not support a finding that any violation of the federal rule was deliberate, intentional, or prejudicial, and the Court has not located any authority

on the precise facts in this case that would dictate that suppression of the evidence for any failure to comply with Rule 41(b) would be required or of "constitutional import."

## IV.   Conclusion

For the reasons set forth above, the undersigned finds that the Cherokee Nation Affidavit did not supply probable cause for the Cherokee Nation search warrant. However, the undersigned magistrate judge recommends a finding that the good faith exception to the exclusionary rule applies. Thus, the undersigned **recommends** that the Chief District Judge **deny** the defendants' motion to suppress.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Crim. P. 59(b)(2), a party may file specific written objections to this Report and Recommendation. The exigencies of the Court's calendar amid the ongoing *McGirt* crisis, and the need to maintain the ensuing trial date in this matter, require the Court to shorten the window for filing any objections and responses. *See United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978); *Sabal Trail Transmission, LLC. v. 7.72 Acres in Lee Cnty., Ala.*, No. 3:16-CV-173-WKW, 2016 WL 10789585, at *1 (M.D. Ala. June 6, 2016) (collecting cases).[7] Any objections must be filed

---

[7]     Specifically, the Northern and Eastern Districts of Oklahoma have unprecedented caseloads and jurisdictional complexities since the Supreme Court's decision in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020). *McGirt* caused an immediate increase of nearly 200% in the number of criminal cases filed in the Northern District and more than 400% in the Eastern District.  See https://www.uscourts.gov/news/2021/09/28/judiciary-supplements-judgeship-request-prioritizes-courthouse-projects.  This extraordinary number of criminal cases thrust into federal court is unlike anything ever seen in this Country's history.  Indeed, the Supreme Court has since recognized the "significant challenge for the Federal Government and for the people of Oklahoma" in the wake of *McGirt*. *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2492 (2022). Numerous federal courts have "noted *McGirt*'s tremendous impact." *United States v. Budder*, 601 F. Supp. 3d 1105, 1114 (E.D. Okla. 2022) (collecting cases), aff'd 76 F.4th 1007 (10th Cir. 2023).

on or before **May 31, 2024**; any response to any objections must be filed on or before **June 4, 2024**.

If specific written objections are timely filed, Fed. R. Crim. P. 59(b)(3) directs the district judge to:

> consider de novo any objection to the magistrate judge's recommendation.  The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions.

Fed. R. Crim. P. 59(b)(3); see also 28 U.S.C. § 636(b)(1).  Failure to timely object waives a party's right to appellate review.  *See United States v. Goebel*, 959 F.3d 1259, 1266-67 (10th Cir. 2020).

DATED this 28th day of May, 2024.


Christine D. Little
United States Magistrate Judge